UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RUSH MASONRY INC. and RANDALL RUSH,          Case No.: 1:24-cv-06520-CM

                    Plaintiffs,

        -against-

DYNASTY CAPITAL 26 LLC, FUNDING
EXPERTS INC, LINCOLN FUNDING
SOLUTIONS LTD, WOODMERE CAPITAL
LLC, ACE RECOVERY GROUP LLC,
LEXINGTON RECOVERY LLC, TRITON
RECOVERY LLC, JOHN DOE 1-10, JANE DOE
1-10, CORPORATION XYZ 1-10

                    Defendants.

---

## DEFENDANTS FUNDING EXPERTS INC AND TRITON RECOVERY LLC'S MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCITON

WELLS LAW P.C.
Steven W. Wells
Will Parsons
229 Warner Road
Lancaster, New York 14086
Tel.: (716) 983-4750
Email: steve@wellspc.com
Email: will@wellspc.com

*Counsel for Defendants Funding Experts Inc and
Triton Recovery LLC*

i

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES………………………………………………………….…….iv

PRELIMINARY STATEMENT………………………………………………………….1

FACTUAL AND PROCEDURAL BACKGROUND…………………………………...…..3

    I.     The Agreements………………………………………...………….....……..3

    II.    Plaintiffs' Breach of the Agreements and the Guaranties…………………………5

    III.   The Account Debtor Notices……………………………………………….…7

    IV.   The Florida Lawsuit………………………………………………………….7

    V.    Plaintiff's Complaint………………………………………...……….…….8

    VI.   Plaintiff's Motion for Preliminary Injunction……………………………………8

LEGAL STANDARD………………………………………………………….……….8

LEGAL ARGUMENT……………………………………...…………….……......….9

    I.     Plaintiffs Are Barred From Bringing Their Claims Against Defendants
         Because The Court Does Not Have Personal Jurisdiction Over Defendants……...9

    II.    The Agreements Have An Exclusive Venue Provision Identifying Florida
         State Court in Miami-Dade County as the Proper Forum…………………………10

    III.   If Plaintiffs' Complaint Isn't Dismissed, the Court Should Stay the
         Proceedings Because There is a Prior Action Pending Between
         Plaintiffs and Defendants………………………………………………...……11

    IV.   Plaintiffs Haven't Satisfied the Necessary Requirements to Obtain a
         Preliminary Injunction…………………………………………….……...12

         A.    Plaintiffs Haven't Established That They Will Suffer Irreparable
             Harm if the Preliminary Injunction is Granted………………………..12

         B.    Plaintiffs Haven't Established a Likelihood of Success on Their
             Causes of Action and Haven't Raised Sufficiently
             Meritorious Questions…………………………………………...……..14

1.      Plaintiffs Have No Likelihood of Success on Their First
        Cause of Action for Violation of N.Y. UCC Section 9-607(c)'s
        Commercially Reasonable Requirement…………………………14

2.      Plaintiffs Have No Likelihood of Success on Their Second
        Cause of Action for Violation of N.Y. UCC Section 1-304
        and Section 9-102(a)(43)……………………………..…………17

3.      Plaintiffs Have No Likelihood of Success on Their Third
        Cause of Action for RICO Conspiracy…………………………..18

        a.      Plaintiffs Haven't Alleged the Existence of a RICO
                Enterprise or a RICO Persons…………………………..…18

        b.      Plaintiffs Haven't Alleged a Pattern of
                Racketeering Activity…………………………..…………19

        c.      Plaintiffs Haven't Alleged Collection of Unlawful Debt..19

                i.      The Agreements Aren't Loans Subject to
                        Usury Laws…………………………………...……20

                ii.     Plaintiffs Haven't Alleged that the Purchase
                        Agreement Carries Twice the Enforceable
                        Interest Rate…………………………..…………22

                iii.    Plaintiffs Haven't Alleged that the Debt was
                        Incurred in a Connection with the Buyer's
                        Business of Lending Money at a
                        Usurious Rate……………………………………22

C.      Public Policy Favors Denying the Motion……………………...……22

CONCLUSION………………………………………………………………...…...23

# TABLE OF AUTHORITIES

**Cases**

*Brownstone Funding Corp. v. Happy Travels Miami LLC*,
   2023 N.Y. Misc. LEXIS 3007, at *9 (Sup. Ct. 2023)…………………………...…..14

*Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*,
   159 A.D.3d 507, 507 (1st Dep't 2018)……………………………………………...……20

*Chase Manhattan Bank, N.A. v. Our Own Farm, Inc.*,
   237 A.D.2d 222, 223 (1st Dep't 1997)……………………………………………...……14

*Crawford v. Franklin Credit Mgmt. Corp.*,
   758 F.3d 473, 487 (2d Cir. 2014)…………………………………………………………..18

*.DeFalco v. Bernas*,
   244 A.D.2d 286, 306 (2d Cir. 2001)…………………………………………………...……18

*Donatelli v. Siskind*,
   170 A.D.2d 433, 434 (2d Dep't 1991)……………………………………...……………20

*Eades v. Kennedy, PC L. Offs.*,
   799 F.3d 161, 168 (2d Cir. 2015)……………………………………………………………..9

*ExpertConnect, LLC v. Fowler*,
   2019 WL 13388548, at *1 (S.D.N.Y. Aug. 15, 2019)……………………...……..…..9

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110, 118 (2d Cir. 2009)……………………………………………………………...12

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159, 182 (2d Cir. 2004)……………………………………………...……………14

*Fossil Grp., Inc. v. Angel Seller LLC*,
   627 F. Supp. 3d 180, 199 (E.D.N.Y. 2022)……………………………………...……18

*Giventer v. Arnow*,
   37 N.Y.2d 305, 309 (1975)…………………………………………………………………20

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60, 66 (2d Cir. 2007)………………………………………………………..…..8

*Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*,
   2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021)…………………………………………12

*Intl. Nut Alliance, LLC v Bank Leumi USA*,
   2016 NY Slip Op 31848[U], at *11 (Sup. Ct. 2016)……………………………...……14

*Kelly, Grossman & Flanagan, LLP v. Quick Cash, Inc.*,
   2012 WL 1087341, at *6 (Sup. Ct. Suffolk Cty. Mar. 29, 2012)…………………...……20

*Manufacturers & Traders Tr. Co. v. Pro-Mation, Inc.*,
   115 A.D.2d 976 (4th Dep't 1985)…………………………………………….………...14

*Martinez v. Bloomberg LP*,
   740 F.3d 211, 217 (2d Cir. 2014)………………………………………………….……..10

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638, 650 (2d Cir. 2015)…………………………………………………...……..9

*Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*,
   292 F. Supp. 3d 601, 603 (S.D.N.Y. 2017)………………………………….………..12

*Principis Cap., LLC v. I Do, Inc.*,
   201 A.D.3d 752 (2d Dep't 2022)………………………………………………...………20

*Related Companies, L.P. v. Ruthling*,
   2017 WL 6507759, at *18 (S.D.N.Y. Dec. 18, 2017)…………………………...………19

*Rubenstein v. Small*,
   273 A.D. 102, 104 (1st Dep't 1947)……………………………..…………………20

*S&M Indus., LLC v Advantage Platform Servs., Inc.*,
   2023 NY Slip Op 50905[U], at *5 (Sup. Ct. 2023)……………………………...………14

*Salinger v. Colting*,
   607 F.3d 68, 82 (2d Cir. 2010)………………………………………………...…………12

*Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*,
   2023 WL 5161995 (N.Y. App. Div. Aug. 11, 2023)……………………………………20

*Seidel v. 18 E. 17th St. Owners*,
   79 N.Y.2d 735, 744 (1992)………………………………………………………………20

*Spin Master Ltd. v. 158*,
   463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020)…………………………………………….9

*Streamlined Consultants, Inc. v. EBF Holdings LLC*,
   2022 WL 4368114, at *4 (S.D.N.Y. Sept. 20, 2022)……………………………..………20

*Thompson v. Daxor Corp.*,
   2024 WL 1484192, at *3 (S.D.N.Y. Apr. 5, 2024)……………………………………11

*Ujueta v. Euro-Quest Corp.*,
   29 A.D.3d 895, 895-96 (2d Dep't 2006)……………………………………...……..20

*Universal Gypsum of Georgia, Inc. v. Am. Cyanamid Co.*,
   390 F. Supp. 824, 826 (S.D.N.Y. 1975)……………………………………………11

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
   334 F. Supp. 3d 566, 567 (S.D.N.Y. 2018)………………………………………..8

*Weisel v. Pischel*,
   197 F.R.D. 231, 241 (E.D.N.Y. 2000)…………………………………...……20

*Worthy Lending LLC v. New Style Contractors, Inc.*,
   39 N.Y.3d 99, 101 (2022)………………………………………………….....14

*XL Ins. Am., Inc. v. DiamondRock Hosp. Co.*,
   414 F. Supp. 3d 605, 608 (S.D.N.Y. 2019)……………………………...……10

*Zoo Holdings, LLC v. Clinton*,
   814 N.Y.S.2d 893 (Sup. Ct. 2006)…………………………………………20

**Statutes**

18 U.S.C. § 1961……………………………………………………………………19

18 U.S.C. § 1962……………………………………………………………………14

N.Y. UCC Section 1-304……………………………………………………...……17

N.Y. UCC Section 9-102……………………………………………………..……..17

N.Y. UCC Section 9-406……………………………………………...……………15, 17, 22

N.Y. UCC Section 9-607……………………………………………...……………14, 17, 22

Defendants FUNDING EXPERTS INC ("Buyer") and TRITON RECOVERY ("Triton" or "Collector") (collectively "Defendants") hereby submit this memorandum of law in opposition of the motion of Plaintiffs RUSH MASONRY INC. ("Seller") and RANDALL RUSH ("Guarantor") (collectively "Plaintiffs") for a preliminary injunction (the "Motion") and states as follows.

## PRELIMINARY STATEMENT

This case arises out of Plaintiffs' breaches of two Standard Merchant Cash Advance Agreements (the "Agreements") and accompanying personal guaranties of performance. This isn't the only case, however, that has arisen from these same facts. There is currently an action pending in the Circuit Court of the 11th Judicial District in and for Miami-Dade County, Florida in which Buyer has sued Plaintiffs for breach of the Agreements and Guaranties. Under the Agreements, the parties agreed that the state courts of Florida in Miami-Dade County would be the sole and exclusive venue for litigation arising out of or related to the Agreements. Plaintiffs, therefore, should have filed their claims in this action as compulsory counterclaims in the Florida action. That's especially true since Defendants aren't subject to personal jurisdiction in New York. Respectfully, this action as against Buyer and Collector is not properly before the Court and, for that reason, Plaintiff's motion should be denied.

Plaintiffs' motion should also be denied, however, because Plaintiffs have failed to meet the standard for a preliminary injunction.

As to irreparable harm – the sine qua non of injunctive relief – Plaintiffs provide no evidence other than a conclusory, three-page Affidavit from Mr. Rush, which is patently insufficient. Putting that aside, Mr. Rush's Affidavit states that, as a result of the alleged wrongful

conduct at issue, Seller halted its business operations more than four months ago. Any alleged harm, therefore, has already occurred and there's no need for a preliminary injunction.

As to the second factor – the likelihood of success on the merits – Plaintiffs have no likelihood of success on the merits. They are essentially complaining of a situation they created and agreed to in the contracts that they signed with the buyer's named as defendants in this action. The gist of Plaintiffs' Complaint is that Defendants acted in a commercially unreasonable manner in serving UCC lien notices on Seller's account debtors after Seller defaulted under the Purchase Agreement. This remedy, however, was expressly to by the Seller in the Agreements and is further authorized sections 9-406 and 9-607 of the Uniform Commercial Code (the "UCC") and the Agreements. Moreover, New York courts have repeatedly held, as a matter of law, that a secured party's serving UCC lien notices on account debtors is commercially reasonable. Plaintiffs suggest that Defendants colluded with the other defendants in this case – their competitors – to serve UCC lien notices on Merchant around the same time. Not only didn't this happen, it makes no sense. Defendants wouldn't prejudice their right to recovery by potentially allowing other secured creditors to cut them in line nor would they benefit from shutting down Seller's Business operations because that would make it more difficult to collect the outstanding balance owed to Buyer It is the fact that Seller entered into so many revenue based financing agreements and then defaulted on each one that caused multiple secured parties to exercise their rights under Article 9 of the UCC. Plaintiffs also suggest that Defendants somehow violated RICO's conspiracy provision even though Plaintiffs don't allege a RICO enterprise or a culpable RICO person. Plaintiffs' causes of action are utterly without merit and, for this additional reason, Plaintiffs' motion should be denied.

Finally, the public interest militates against injunctive relief.  Seller received $607,000 under the Agreements (before the deduction of fees) and then remitted only $27,000 of its receipts before defaulting; meaning that, to date, Seller has **gained** $580,000 from the parties' transactions. Seller now seeks to prevent Buyer from exercising its contractual and statutory remedies to collect the receipts that Seller failed and refused to deliver.  Injunctive relief under these circumstances would frustrate the public interest favoring enforcement of contracts and the right of secured parties to exercise statutory remedies under the UCC.

Pursuant to the foregoing – and as set forth more fully herein – Defendants respectfully submit that Plaintiffs' motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Agreements.

On April 11, 2024, Buyer entered into a Standard Merchant Cash Advance Agreement (the "First Agreement") pursuant to which Buyer purchased 15% of Seller's total future receipts up to the sum of $627,760 in exchange for a discounted upfront purchase price of $532,000. (Declaration of Yair Berkowitz ("Berkowitz Decl.") ¶ 7, Ex. C at p. 2).[1]  On April 15, 2024, Buyer and Seller entered into a second Standard Merchant Cash Advance Agreement (the "Second Agreement") pursuant to which Buyer purchased 15% of Seller's total future receipts up to the sum of $111,750 in exchange for a discounted upfront purchase price of $75,000. (*Id.* ¶ 9, Ex. E at p. 2).

Under the Agreements, Seller agreed to deliver the purchased amount of receipts to Buyer through daily remittances of $9,000 (the First Agreement) and $3,000 (the Second Agreement), which amounts were initial good faith estimates of the specified percentages of Seller's average

---

[1] The Declaration of Yair Berkowitz is being contemporaneously filed herewith.

daily receipts. (*Id.*, Exs. C, E at p. 2). The daily remittances were to be collected each business day and credited toward the purchased amount of receipts. (*See id.*).

The daily remittances weren't a set figure but could be adjusted based on Seller's revenue. To that end, the Agreements included a mandatory reconciliation provision pursuant to which the daily remittances could be adjusted to more closely reflect the specified percentage of Seller's actual daily receipts. (*Id.* ¶ 12, Exs. C, E § X). The Agreements specifically provide as follows:

> **RECONCILIATION.**
>
> **a.** **[Seller's] Right for Reconciliation.** The Parties each acknowledge and agree that:
>
>    **i.** If at any time during the term of this Agreement [Seller] shall experience unforeseen decreases to their Daily Receipts, the [Seller] shall have the right, at its sole and absolute discretion, to request a modification to their Scheduled Remittance.
>
>    **ii.** Such modification to their Scheduled Remittance (the "Reconciliation") shall be performed by [Buyer] within five (5) Business Days following the written request by [Seller] for said Reconciliation.
>
> **b.** **Reconciliation Procedure.**
>
>    **i.** [Seller] shall submit a written request for Reconciliation via email to info@fundingexperts.com with the subject line, "REQUEST FOR RECONCILIATION";
>
>    **ii.** Said written request shall include a copy of the [Seller's] most recent bank statement and credit card processing statement;
>
>    **iii.** [Buyer] shall have five (5) Business Days to review the Request for Reconciliation
>
> **c.** **Warranties.** The [Seller] shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper. Nothing set forth in this Agreement shall be deemed to provide the [Seller] with the right to interfere with [Buyer'] right and ability to debit the Approved Bank Account while the request for Reconciliation is pending or until the Purchased Amount is collected by [Buyer] in full; or modify the amount of the Initial Daily Installment for any calendar month without prior approval of all Parties.

(*Id.*) (bold and underline in the original). Buyer wasn't required to perform a reconciliation unless Seller made a written request to Buyer and provided the necessary documents and information. (*See id.*) Seller never made a such written request or provided the necessary documents and information such a reconciliation was never performed. (*Id.* ¶ 12).

Pursuant to Section VIII.a of the Agreements, Seller granted Buyer a security interest in, among other collateral, all accounts, deposit accounts, accounts receivable, and other receivables (the "Accounts Collateral"). (*Id.* ¶ 15, Exs. C, E). Seller agreed that, if it breached the Agreements, Buyer was authorized to "[e]nforc[e] its rights as a secured creditor, including, but not limited to, notifying any account debtor(s) of the seller's security interest" and to "notify[] the Seller's credit card processor of this Agreement and to direct such credit card processor to make payments directly to the Purchaser of any and all amounts received by said credit card processor on behalf of Seller." (Declaration of Leopoldo Vargas ("Vargas Decl.") ¶ 7; Berkowitz Decl., Exs. C, E §§ IX.c.i and iii).[2]

Finally, the Agreements included Personal Guaranties of Performance (the "Guaranties") pursuant to which Guarantor guaranteed the performance of Seller's obligations to Buyer under the Agreements. (*Id.* ¶ 13, Exs. C, E at pp. 17-20).

## II. Plaintiffs' Breach of the Agreements and Guaranties.

On or about April 11, 2024, Buyer funded the First Agreement (less applicable and disclosed upfront fees0 by applying $505,400 of the purchase price to satisfy the outstanding balance that Seller owed to Defendant Lincoln Funding Solutions Ltd under an agreement between the two parties. (*Id.* ¶ 7).

After receiving the purchase price under the First Agreement, Seller made remittances totaling only $27,000, leaving an outstanding balance of $600,760 on the purchase amount of its receipts. (*Id.* ¶ 16, Ex. F).

On April, 19 and 22, 2024, Seller defaulted under Section XIX.a.viii of the First Agreement by revoking Buyer's ACH Authorization to debit the designated account and interfering with

---

[2] The Declaration of Leopoldo Vargas is being filed contemporaneously herewith.

Buyer's collection of the purchased amount of receipts. (*Id.* ¶ 17, Ex. C § XIX, at p. 15, Exs. F, G). Seller also defaulted under Section XIX.a.i. by ceasing to remit any its receipts after April 17, 2024 despite continuing to conduct business and generate receipts.  (*Id.* ¶ 17, Exs. C, F).

On or about April 15, 2024, Buyer funded the $75,000 purchase price under the Second Agreement less applicable and disclosed upfront fees. (*Id.* ¶ 18, Ex. E at Ex. A – Applicable Fees; §6.a).

1.      Pursuant to Addendum B – Early Pay Repurchase Schedule of the Second Agreement, Seller was given the option to repurchase the purchased amount of receipts for $73,500 if paid by April 19, 2024, or for $77,000 if paid by April 30, 2024. (*Id.* ¶ 19, Ex. E at ADDENDUM B - EARLY PAY REPURCHASE SCHEDULE). After Seller failed to exercise its repurchase options, Buyer learned that its purchase price had funded, in part, payment to another merchant cash advance company in the amount of $100,000 in violation of Sections V and XVII.l. & m of the Second Purchase Agreement. (*Id.* ¶ 20, Ex. E). When confronted with this information, Mr. Rush continually made excuses for why he was unable to begin remitting on the estimated daily remittance on the Second Contract (daily remittances had not commenced under the Second Purchase Agreement because, as stated above, Seller was giving Buyer the opportunity to repurchase the purchased amount of receipts if it did so by the dates in the addendum).  During the week of April 29-May 3, 2024, Mr. Rush advised me that he had taken out several other merchant cash advances that he defaulted under that were likely going to file actions against him and told me that Buyer should "just go ahead and file" which further indicated that Seller was not going to make any further remittances on either Agreement having terminated Buyer's ACH Authorization to debit the Account.

. (*Id*. ¶ 21, Ex. H). In addition to the defaults based upon Seller's misuse of the purchase price under the Second Agreement, Seller breached its obligations under the Second Agreement by failing to remit any of its receipts despite continuing to conduct business operations and generate revenue. (*Id.*).

Guarantor breached the Guaranties by failing to perform Seller's obligations to Buyer when Seller defaulted on the Agreements. (*Id*. ¶ 22).

### III. The Account Debtor Notices.

On May 3, 2024, following Plaintiffs' breach of the Agreements and pursuant to the terms of the Agreements and the UCC, Collector sent thirty-three (33) account debtor notices to account debtors or payment processors that it had a good faith basis to believe might be indebted to Seller (the "Notices"). (Vargas Decl. ¶ 11). None of the account debtors are located in New York. (*Id*. ¶ 13). Moreover, Collector did not coordinate or communicate in any way with Ace Recovery Group LLC or Lexington Recovery Group in sending out the Notices. (*Id*. ¶ 19).

The Notices provided Seller's account debtors with notice (i) that Seller had defaulted under the Agreements; (ii) of the balance Seller owes to Buyer; (iii) that Buyer had a perfected security interest in Seller's accounts receivables; and (iv) that the account debtors should make payments to Collector as an agent for Buyer. (Doc. No. 1-9 at pp. 4-12). In response to the Notices, Collector received one $1,596.01 payment from Landis Construction. (Vargas Decl. ¶¶ 11-12). Collector has not received any other payments from the account debtors. (*Id.*).

### IV. The Florida Lawsuit.

In addition to sending the account debtor notifications, Collector also referred this matter to legal counsel for the purpose of commencing a lawsuit for Plaintiffs' breach of the Agreements. (*Id*. ¶ 14). The Agreements contain a forum selection clause identifying state courts in the State

of Florida, Miami-Dade County as the sole and exclusive forum for disputes arising out of the Agreements. (Berkowitz Decl., Exs. C, E § X.i).  On May 7, 2024, pursuant to the forum selection clause in the Agreements, Buyer commenced an action in the Circuit Court of the 11th Judicial District in and for Miami-Dade County, Florida (the "Florida Action"). (Vargas Decl. ¶¶ 15-16, Ex. B). Plaintiff raised the issues raised in this action as an affirmative defense their Answer filed in the Florida Action.  (Vargas Decl ¶ 17; Ex. A). Buyer has filed a motion for summary judgment in the Florida Action which is currently returnable on October 30, 2024. (*Id.* ¶ 17).

### V.  Plaintiffs' Complaint.

On August 29, 2024, Plaintiffs filed a Summons and Complaint against Defendants for allegedly (i) violating NY UCC Section 9-607(c); (ii) violating NY UCC Section 1-304 and Section 9-102(a)(43); and (iii) violating 18 USC Section 1962(d). (*See* Doc No. 1, Compl.)  The gist of Plaintiff's Complaint is that Defendants acted in a commercially unreasonable manner and engaged in a RICO conspiracy by serving the Notices on Defendants' account debtors.  (*See id*.)

### VI. Plaintiffs' Motion for Preliminary Injunction.

On September 9, 2024, Plaintiffs filed their Motion pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking to have their account debtors pay the Court any amount owed to Seller during the pendency of the action and have the Court dispense the funds as it deems just and appropriate. (Doc. No. 7 at p. 1).  Defendants now respond in opposition.

### <u>LEGAL STANDARD</u>

"A preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies,' and, as such, it is 'one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 334 F. Supp. 3d 566, 567 (S.D.N.Y. 2018) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60,

66 (2d Cir. 2007)). To succeed on their Motion, Plaintiff must establish (i) irreparable harm; (ii) a likelihood of success on the merits or, serious questions on the merits and a balance of hardships *decidedly* in favor of the moving party; and (iii) that a preliminary injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *ExpertConnect, LLC v. Fowler*, 2019 WL 13388548, at *1 (S.D.N.Y. Aug. 15, 2019) (emphasis added).

## **LEGAL ARGUMENT**

### I.  **Plaintiffs are Barred from Bringing Their Claims Against Defendants Because the Court Does Not Have Personal Jurisdiction Over Defendants.**

To establish personal jurisdiction over Defendants pursuant to New York's long-arm statute, Plaintiffs must establish (1) that Defendants transacted business within the state; and (2) that its claims arise from that business activity. *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 168 (2d Cir. 2015); *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020).

Plaintiffs cannot satisfy these requirements.  Plaintiffs' claims against Defendants in this lawsuit arise out of the Agreements and the Notices that were sent to Seller's account debtors. (*See* Doc. No. 1, Compl.)  Plaintiffs are citizens of Louisiana. (*Id.* ¶¶ 9-10). Buyer and Collector are citizens of Wyoming and Florida respectively. (Berkowitz Decl. ¶ 4; Vargas Decl. ¶ 3). Thus, the Agreements are transactions between a Wyoming company and a Louisiana company and do not constitute business transacted within New York state. Similarly, none of the Notices that Collector sent were to account debtors in New York. Accordingly, even if Plaintiffs could demonstrate that Defendants transacted business within New York – and they have failed to do so – Plaintiff's claims don't arise out of business activity transacted in New York. Thus, this Court does not have personal jurisdiction over Defendants and Plaintiff's motion should be denied.

## II.    The Agreements Have an Exclusive Venue Provision Identifying Florida State Court in Miami-Dade County as the Proper Forum.

Forum selection clauses are presumptively enforceable in federal court if the clause was communicated, has mandatory force, and covers the claims and parties involved in the dispute. *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014); *XL Ins. Am., Inc. v. DiamondRock Hosp. Co.*, 414 F. Supp. 3d 605, 608 (S.D.N.Y. 2019). The presumption of enforceability "can only be overcome by 'making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.*

Here, the Agreements have a forum selection clause providing that "[a]ny suit, action or proceeding arising hereunder…shall be…instituted in a state court sitting in the State of Florida, in Miami-Dade County, without regard to conflict of law provisions." (Berkowitz Decl., Exs. C, E § XX.i). The forum selection clause also provides that a state court sitting in the State of Florida, in Miami-Dade County (the "Acceptable Forum") shall be the "sole and exclusive forum for any and all disputes arising out of or relating to" the Agreements. (*Id.*). The forum selection cause was communicated to Plaintiffs as it is clearly labelled in the Agreements. Furthermore, by the terms of the clause itself, the clause has mandatory force and covers the claims and parties in dispute. Accordingly, the forum selection clause is presumptively enforceable and precludes this Courtfrom asserting jurisdiction over Defendants or Plaintiffs' causes of action. Unless and until Plaintiffs demonstrate that it would be unreasonable or unjust to enforce the provision – and they have made no effort to do so – Plaintiffs' claims are not properly before the Court and, respectfully, Plaintiff's motion should be denied.  In fact, pursuant to Section X.i of the Purchase Agreement, the "Parties agree that the Acceptable Forum is convenient and submit to the jurisdiction of the Acceptable forum and waive any and all objections to jurisdiction or venue.") (*Id.* at § X.I.)

**III.    If Plaintiffs' Complaint Isn't Dismissed, the Court Should Stay the Proceedings Because There is a Prior Action Pending Between Plaintiffs and Defendants.**

It has long been held that the district court has the power to stay its proceedings when there exists a simultaneously pending state court action in which the same dispute is being litigated by the same parties. *Universal Gypsum of Georgia, Inc. v. Am. Cyanamid Co.*, 390 F. Supp. 824, 826 (S.D.N.Y. 1975). In determining whether to stay proceedings due to a simultaneously pending state court action, district courts consider "(1) [] comity; (2) promotion of judicial efficiency; (3) adequacy and extent of relief available in the alternative forum; (4) identity of parties and issues in both actions; (5) likelihood of prompt disposition in the alternative forum; (6) convenience of parties, counsel and witnesses; and (7) possibility of prejudice to a party as a result of the stay." *Id.* at 827; *Thompson v. Daxor Corp.*, 2024 WL 1484192, at *3 (S.D.N.Y. Apr. 5, 2024).

Here, the foregoing factors militate in favor of staying this action. The interests of comity favor staying this action in favor of the Florida Action that was filed approximately four and a half months before this one. A stay would promote judicial efficiency by avoiding duplicative litigation. Plaintiffs can obtain the same relief in the Florida Action that they can obtain in this one (including against Triton who would be subject to personal jurisdiction in Florida) by asserting counterclaims in the Florida Action. The parties in the Florida Action and this action are substantially the same. The Florida Action will likely result in a prompt disposition, especially given that there is a motion for summary judgment currently pending and Plaintiffs have raised the issue regarding the Buyer's utilization of Article 9 remedies in send the Notices as an affirmative defense in that action. (Vargas Decl. Ex. C at ¶ 11). The Florida Action would be just as convenient for the parties, counsel, and witnesses as this action. Finally, Plaintiffs can't be heard to complain of any prejudice as a result of a stay since they could have (and should have) asserted their claims in this action as compulsory counterclaims in the Florida Action.

Respectfully, if the Court doesn't dismiss this action against Defendants for lack of personal jurisdiction and improper venue, it should stay the action and decline to adjudicate Plaintiffs' motion that could have (and should have) been filed in the Florida Action or transfer it to the Florida Action. (*See* Agreements at § I (Should a proceeding be initiated in any other forum [other than the Acceptable Forum], the parties waive the right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

### IV. Plaintiffs Haven't Satisfied the Necessary Requirements to Obtain a Preliminary Injunction.

#### A. Plaintiffs Haven't Established That They Will Suffer Irreparable Harm if the Preliminary Injunction is not Granted.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "To satisfy the irreparable harm requirement, [Plaintiffs] must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent.'" *Grand River*, 481 F.3d at 66; *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 292 F. Supp. 3d 601, 603 (S.D.N.Y. 2017). Furthermore, the Court should not presume the irreparable harm alleged by Plaintiff, Plaintiff must prove actual "evidence that the irreparable harm will in fact occur." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010); *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021).

Here, Plaintiffs suggest that they will be irreparably harmed if the preliminary injunction isn't granted because they will be unable to complete projects, resulting in the loss of longstanding business relationships "with some or all of the account debtors" and the failure of its business. (Doc. No. 8 ¶ 15). Initially, as noted, Plaintiffs' only proof of alleged irreparable harm is the

conclusory, three-page Affidavit of Mr. Rush, which is insufficient to demonstrate irreparable harm. Moreover, as also noted, Seller allegedly halted its business operations more than four months ago (*Id.* ¶ 11). Any alleged harm, therefore, has already occurred and there's no need for a preliminary injunction. Putting aside the foregoing, any alleged harm that Plaintiffs vaguely suggest might occur in the future – *e.g.*, loss of business relationships – isn't actual and imminent, but remote and speculative and unsupported by any concrete evidence (such as written correspondence with any customers or vendors demonstrating strained business relations).

Furthermore, the only evidence submitted by Plaintiffs in support of their claim for imminent harm are one letter from Broodmoor from May 10, 2024, which gave Seller two days to resolve the dispute regarding unpaid wages. In its response to Triton, Broadmoor indicated that it does not owe Seller any money so it either paid what it owed or terminated its relationship with Seller, such that the harm is already done. (Vargas Decl. at ¶ 11). Norsouth indicated that it is holding $100,00 subject to competing claims. Plaintiffs also claim that the account debtor notifications caused Seller's account debtors to stop all payments to Seller in an amount not less than $3,931,801.35 (Complaint at ¶¶ 35, 49, 60, and 61) and attach an account receivable report (Complaint at Ex. 11) that states that Seller is owed $3,467,255.61. First, many of the accounts are more than 90 days past due. Second, the largest account receivable is from Broadmoor, LLC in the amount of $802,737.39 and Broadmoor advised Triton Recovery that it owed no funds to Seller. (Vargas Decl. at ¶ 11). The next largest accounts receivable was from Gibbs Construction LLC and it stated in its response to Triton that it had terminated its relationship with Seller. Accordingly, the documentary evidence submitted by Plaintiffs does not appear to be accurate.

In any event, Plaintiff's have submitted nothing to demonstrate the immediate and irreparable harm with occur absent the Court's granting of an injunction. By its own admission,

Seller went out of business several months ago so any harm is done.  Accordingly, Plaintiffs have failed to satisfy the "most important prerequisite for the issuance of a preliminary injunction" and, respectfully, Plaintiff's motion should be denied.

**B.  Plaintiffs Haven't Established a Likelihood of Success on Their Causes of Action and Haven't Raised Sufficiently Meritorious Questions.**

**1.  Plaintiffs Have no Likelihood of Success on Their First Cause of Action for Violation of N.Y. UCC Section 9-607(c)'s Commercially Reasonable Requirement**

The entire basis of Plaintiffs' First Cause of Action is that Defendants failed to act in a commercially reasonable manner in sending the Notices to Seller's account debtors pursuant to Sections 9-406 and 9-607.

New York courts, however, have repeatedly rejected this argument and held, as a matter of law, that sending UCC lien notice is commercially reasonable.  *See Chase Manhattan Bank, N.A. v. Our Own Farm, Inc.*, 237 A.D.2d 222, 223 (1st Dep't 1997) ("Plaintiff clearly acted in a commercially reasonable manner in directly seeking to collect payment from the borrower's account debtors"); *see also, e.g., Brownstone Funding Corp. v. Happy Travels Miami LLC*, 2023 N.Y. Misc. LEXIS 3007, at *9 (Sup. Ct. 2023) ("[W]ritten notice to an account debtor is a commercially reasonable action in the event of default under a security agreement"); *S&M Indus., LLC v Advantage Platform Servs., Inc.*, 2023 NY Slip Op 50905[U], at *5 (Sup. Ct. 2023) (finding that the defendant "acted in a commercially reasonable manner" in sending UCC lien notices to plaintiff's account debtors); *Intl. Nut Alliance, LLC v Bank Leumi USA*, 2016 NY Slip Op 31848[U], at *11 (Sup. Ct. 2016) (finding that a secured party's conduct in demanding payment from the plaintiff's account debtors was "commercially reasonable"); *Manufacturers & Traders Tr. Co. v. Pro-Mation, Inc.*, 115 A.D.2d 976 (4th Dep't 1985) ("Defendants' contention that

plaintiff did not act in a commercially reasonable manner when it notified Pro-Mation's accounts receivable debtors and instructed them to remit their payments to the bank is without merit").

That's because sending UCC lien notices is expressly provided for in UCC Section 9-607(a)(1), which states that, "[i]f so agreed, and in any event after default, a secured party [] may notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party." In this case, it's also expressly provided for in the Agreements, which state that, if Seller breaches the Agreements Buyer is authorized to "[e]nforc[e] its rights as a secured creditor, including, but not limited to, notifying any account debtor(s) of the seller's security interest" and to "notify[] the Seller's credit card processor of this Agreement and to direct such credit card processor to make payments directly to the Purchaser of any and all amounts received by said credit card processor on behalf of Seller." (Vargas Decl. ¶ 7; Berkowitz Decl., Exs. C, E §§ IX.c.i and iii). Finally, it's expressly provided for in UCC Section 9-406(a), which provides that, "[a]fter receipt of the [required] notification, [an] account debtor may discharge its obligation by paying the assignee [e.g., the secured party] and may not discharge the obligation by paying the assignor [*e.g.*, the debtor]." *See also Worthy Lending LLC v. New Style Contractors, Inc.*, 39 N.Y.3d 99, 101 (2022) ("Under UCC 9–406, a security interest is an assignment and the UCC is purposefully structured to permit a debtor to grant creditors security interests in a debtor's receivables so that the secured creditor can direct account debtors to pay it directly"). Defendants acting in a manner that is authorized by both statute and contract can't be commercially reasonable.

Plaintiffs claim that sending contemporaneous and competing UCC lien notices "demanding $1,566,961.39" wasn't commercially reasonable because it interrupted and halted Seller's business operations. (Doc. No. 1, Compl. ¶¶ 49, 51). Defendants didn't send the Notices

contemporaneously with the other secured parties and didn't coordinate or communicate in any way with Ace Recovery Group LLC or Lexington Recovery Group in sending out the Notices. (*See* Vargas Decl. ¶ 19). Collector sent the Notices on May 3, 2024, within two weeks of Plaintiffs' breach, and roughly one month after Defendant Ace Recovery Group sent its account debtor notices. (Doc. No. 1-9 at pp. 1-12). To be clear, Triton, Lexington Recovery and Ace Recovery are competitors, not parties in collusion. Each collection agency enforces its clients' rights as quickly and efficiently as possible without regard to what other collection agencies are doing. And, their goal is to enforce their clients contractual and statutory remedies, which Seller agreed to, not to interrupt its business.

Further, Plaintiffs' claim isn't supported by any legal authority. (*See id*.) Instead, Plaintiffs proffer an inadmissible opinion from a third-party with no involvement in this case that it was foreseeable that account debtors would become confused and halt payments, resulting in the interruption of Seller's business, because there were multiple secured parties sending notices to account debtors. (Doc. No. 9 ¶ 17). This speculative opinion testimony is entitled to no weight

Moreover, if Plaintiffs didn't want multiple secured creditors to send UCC lien notices to their account debtor – which secured parties are entitled to do by law – Plaintiffs shouldn't have entered into multiple purchase agreements, accepted and retained the purchase prices and defaulted under each within a two-month time frame. Upon information and belief, Plaintiffs entered into more revenue based financing contracts that just the ones at issue in this case. The UCC doesn't require secured creditors to analyze the impact on the debtor or to communicate with other secured parties before enforcing their statutory rights. Because the UCC is a comprehensive set of laws, mere opinions won't rewrite the statutory authority to impose such requirements. If Plaintiffs and Mr. Henning believe that the UCC should require secured creditors to (i) independently analyze

the impact that sending lien notice will have on debtors or, (ii) communicate with other secured creditors to ensure that sending lien notices won't negatively impact a debtor's business, they should direct their opinions to the Permanent Editorial Board for the UCC. This Court isn't the proper authority to read requirements into the UCC that don't currently exist. And, the standards that Plaintiffs and their "expert" are propounding are entirely unreasonable, impractical and will never end up in the UCC as it would essentially render UCC 9-607 and 9-406(a) useless.

Plaintiffs also seem to suggest that Defendants acted in a commercially unreasonable manner because Defendants' Notices prevented Seller from collecting $3,931,801.35 from its account debtors. (Doc. No. 1, Compl. ¶ 50). As stated above, that is not even an accurate number. However, each Notice that Defendants issued clearly that Seller owed Buyer $859,786.90 and that payments should be made to Collector *until the $859,786.90 is paid in full*. (Doc. No. 1-9 at pp. 4-11) (emphasis added). Thus, Defendants were very clear that the account debtors should continue making payments to Seller once Seller's obligation to Buyer had been satisfied. The account debtors' made the decision to halt all payments completely independent of Defendants and accordingly, Plaintiffs have no basis to hold Defendants liable for the effects of the same.

### 2. Plaintiffs Have no Likelihood of Success on Their Second Cause of Action for Violation of N.Y. UCC Section 1-304 and Section 9-102(a)(43)

Plaintiff seeks to hold Defendants liable for allegedly violating the obligation of good faith under UCC Section 1-304. The UCC, however, states that "this section does not support an independent cause of action for failure to perform or enforce in good faith." NY UCC § 1-304, cmt. 1; *see also JFURTI, LLC v. Singal*, 96 N.Y.S.3d 849 (1st Dep't 2019) (same). Even if that weren't the case, Plaintiffs' "good faith" claim is simply that Defendants "failed to observe commercially reasonable standards of fair dealing" in sending the Notices. (Doc. No. 1, Compl. ¶ 63). That's the exact same as Plaintiff's First Cause of Action and it fails for the same reasons. In

fact, this claim could be asserted against Plaintiffs because they took out multiple cash advances in violation of the Agreements and essentially ended up making their own ponzi scheme whereby purchase prices from new agreements are used to pay obligations owed on prior advances. The thing about Ponzi schemes is that they eventually fall apart, as did Seller's business. But, Mr. Rush was the one that chose to create that decision for his business, not Triton or Buyer.

### 3. Plaintiffs Have No Likelihood of Success on Their Third Cause of Action for RICO Conspiracy.

To establish a violation of § 1962(d) – RICO's conspiracy provision – Plaintiffs must show that Defendants agreed with at least one other entity to commit a substantive RICO offense. *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014). To state a claim under § 1962(d), a plaintiff must allege a valid underlying claim under subsections (a), (b), or (c), plus an agreement to carry out such acts. *See, e.g., First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004). "To establish a violation of 18 U.S.C. § 1962(c) then, a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or collection of unlawful debt. *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).[3] A plaintiff must also "allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name." *Fossil Grp., Inc. v. Angel Seller LLC*, 627 F. Supp. 3d 180, 199 (E.D.N.Y. 2022) (internal quotation marks omitted).

#### a. Plaintiffs Haven't Alleged the Existence of a RICO Enterprise or a RICO Persons

Plaintiffs haven't alleged two of the fundamental elements of a RICO claim: the existence of a RICO enterprise and a RICO person distinct from the enterprise. Plaintiffs, therefore, can't

---

[3] Defendants cite to "18 U.S.C. § 1962(a)(b)(c) and (d)" but the specific allegations are for violation of Section 1962(c) through a pattern of racketeering activity or collection of unlawful debt.

establish an underlying RICO violation and their RICO conspiracy claim fails as a matter of law can can't provide grounds for injunctive relief.

### b. Plaintiffs Haven't Alleged a Pattern of Racketeering Activity.

A plaintiff alleging a pattern of racketeering must establish: (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity. *Related Companies, L.P. v. Ruthling*, 2017 WL 6507759, at *18 (S.D.N.Y. Dec. 18, 2017). "Racketeering activity" is a defined term under Section 1961(1) of the RICO statute and includes an enumerated list of offenses. The alleged RICO offense underlying Plaintiff's RICO conspiracy claim (aside from collection of unlawful debt) – sending "contemporaneous and competing lien notifications" – isn't "racketeering activity" under the statute. And even if it was, Plaintiffs couldn't satisfy the continuity requirement (open-ended or closed-ended) because the alleged wrongful acts took place within the span of a few months and Plaintiffs haven't alleged any threat of continuing criminal conduct. *See Related*, 2017 WL 6507759, at *1. Defendants can't demonstrate a RICO claim predicated on a pattern of racketeering activity.

### c. Plaintiffs Haven't Alleged Collection of Unlawful Debt.

Under RICO, an "unlawful debt" is:

> [A] debt…which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and [] which was incurred in connection with…the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). Thus, to establish a RICO violation for collection of unlawful debt, a plaintiff must "show (1) that the debt was unenforceable under state or federal usury laws; (2) that the debt carried twice the enforceable interest rate; and (3) that the debt was incurred in connection with

the defendants' business of lending money at a usurious rate." *Weisel v. Pischel*, 197 F.R.D. 231, 241 (E.D.N.Y. 2000). Here, Defendants haven't alleged any of these elements.

### i. The Agreements Agreement Aren't Loans Subject to Usury Laws.

As to the first element, Plaintiffs merely claim in conclusory fashion that the Agreements Agreement are, in fact, usurious loans and not bona fide purchases (a conclusory claim that is entitled to no weight).

It is axiomatic that a transaction can't be usurious if it's not a loan. *See, e.g.*, *Seidel v. 18 E. 17th St. Owners*, 79 N.Y.2d 735, 744 (1992). An agreement isn't a loan unless it provides (1) a right of interest on principal, *see Donatelli*, 170 A.D.2d at 434; *Kelly, Grossman & Flanagan, LLP v. Quick Cash, Inc.*, 2012 WL 1087341, at *6 (Sup. Ct. Suffolk Cty. Mar. 29, 2012) ("The concept of usury applies to loans, which are typically paid at a fixed or variable rate over a term.") and (2) an absolute right to repayment, *see, e.g.*, *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947); *Zoo Holdings, LLC v. Clinton*, 814 N.Y.S.2d 893 (Sup. Ct. 2006). New York law includes a strong presumption against a finding of usury, and requires it to be supported by "clear and convincing evidence." *See Ujueta v. Euro-Quest Corp.*, 29 A.D.3d 895, 895-96 (2d Dep't 2006); *see also Giventer v. Arnow*, 37 N.Y.2d 305, 309 (1975).

The great weight of authority in New York – including Appellate Division decisions from the First, Second, and Fourth Departments – has held that revenue-based financing transactions aren't loans. *See Champion Auto Sales, LLC v. Pearl Beta Funding, LLC*, 159 A.D.3d 507 (1st Dep't 2018); *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dep't 2022); *Samson MCA LLC v. Joseph A. Russo M.D. P.C./IV Therapeutics PLLC*, 219 A.D.3d 1126 (4th Dep't 2023). These Appellate Division decisions are consistent with dozens of lower court and federal court rulings. *See Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *5

(S.D.N.Y. Sept. 20, 2022) ("[T]he Court joins an ever-growing group of courts that have held that nearly identical agreements…[are] not [] usurious loan[s]").

New York courts have developed a three-factor test to determine whether a merchant cash advance transaction should be considered a loan (as opposed to a purchase of future receivables). *Samson,* 219 A.D.3d at 1128. Under this test, courts evaluate: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy. *Id*.

Here, the Agreements satisfy all three factors. They have mandatory reconciliation provision providing that, upon Seller's written request and its provision of certain necessary documents, the daily remittances shall be adjusted on a going-forward basis to more closely reflect that Specified Percentage of Seller's actual daily receipts. (Berkowitz Decl., Exs. C, E § X). As a result of this mandatory reconciliation provision – pursuant to which the daily remittances are subject to regular adjustment based on Seller's revenue – there is no fixed date by which Seller is required to remit the purchased amount of receipts and, thus, no finite term. Finally, the Agreements don't make Seller's filing for bankruptcy an event of default. (*See* id., Exs. C, E § XIX). To the contrary, they state that "Seller may not be in breach or default of this Agreement in the event the full Purchased Amount is not remitted because the Seller's business went bankrupt…in the ordinary course of business." (*Id.*, Exs. C, E § XIII.f). As such, Buyer had limited recourse in bankruptcy, the Agreements satisfy the three relevant factors, and the Agreements aren't loans subject to usury laws. Plaintiffs haven't (and can't) allege the first element of a RICO claim predicated on unlawful debt.

### ii. Plaintiffs Haven't Alleged that the Purchase Agreement Carries Twice the Enforceable Interest Rate.

While Plaintiffs' vaguely allude to "usurious interest rates," (Doc. No. 1, Compl. ¶ 5), they don't allege any "interest" rate associated with the Agreements, much less that any such rate is usurious under a specific state's statute. They certainly don't allege that the Agreements had an "interest" rate of more than twice the enforceable limit. In fact, the Agreements do not have interest rates because they are not loans. Plaintiffs, therefore, have failed to allege the second element of a RICO claim predicated on collection of unlawful debt.

### iii. Plaintiffs Haven't Alleged that the Debt was Incurred in Connection with the Buyer's Business of Lending Money at a Usurious Rate.

Finally, Plaintiffs don't allege – much less present evidence – that their the debt was incurred in connection with Defendants' business of lending money at a usurious rate. Defendants, therefore, have failed to allege the third element of a RICO claim predicated on collection of unlawful debt and they have no likelihood of success on their RICO claim.

### C. Public Policy Favors Denying the Motion

Plaintiffs suggest that the public interest will be served by granting the preliminary injunction because it "would make it clear that it is not commercially reasonable and compliant" to send purportedly contemporaneous and competing UCC lien notices. (*See* Doc. No. 1, Compl. ¶ 20). Defendants maintain that granting the preliminary injunction would in face be ***detrimental*** to the public interest. Granting the preliminary injunction would effectively impose additional requirements on secured parties seeking to enforce their contractual and statutory rights that are not provided for in the UCC and that are completely unreasonable. Secured parties would now be forced to (i) independently analyze whether issuing account debtor notices pursuant to security agreements and UCC 9-607 and/or 9-406(a) would negatively impact the debtor's business; and

(ii) determine if a debtor has entered into other agreements, determine if the debtor has defaulted under those agreements, and communicate with other secured parties to ensure UCC notices are sent in a manner that does not negatively impact the debtor's business.

To start, if the preliminary injunction is granted it would immediately become unduly burdensome for secured parties to enforce their rights. Secured parties would be forced to expend additional resources making sure that their enforcement procedures do not negatively impact the debtors business while the party that breached the agreement in the first place sits back and waits for the secured party to find a way to enforce its rights that will not open itself up to potential liability. This is not a good result. Moreover, forcing secured creditors to communicate and determine amongst themselves how to send lien notices in a manner that enforces their rights while also ensuring that debtors' businesses are not harmed would simply lead to increased litigation between secured creditors. Finally, Defendants urge this Court not to forget that Plaintiffs are in this situation because they entered into multiple purchase agreements with multiple companies and defaulted on each agreement within the span of two-months. The public interest would decidedly not be served by allowing Plaintiffs to escape the consequences of their own actions by being allowed to accept and retain the benefits of the MCA agreements, defaulting on their obligations and then preventing the buyers from enforcing their agreed upon rights in the event of default. For the foregoing reasons, Plaintiffs have not met the third element of obtaining a preliminary injunction either.

## <u>CONCLUSION</u>

Pursuant to the foregoing, Plaintiff respectfully submits that the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: September 17, 2024     Respectfully Submitted,


             */s Steven W. Wells*
             WELLS LAW P.C.
             Steven W. Wells
             Will Parsons
             229 Warner Road
             Lancaster, New York 14086
             (716) 983-4750
             Email: steve@wellspc.com
             Email: will@wellspc.com
             *Counsel for Defendants*
             *Funding Experts Inc and*
             *Triton Recovery LLC*